O'SULLIVAN (UNITED STATES v.). See Cases Nos. 15,973–15,975.

OSWALD (LYMAN PATENT REFRIGERATOR CO. v.). See Case No. 8,630.

## Case No. 10,610.

### The OSWEGO.

[8 Ben. 129.] [1]

District Court, S. D. New York. June, 1875.

TOW-BOAT AND TOW—NEGLIGENCE—PLEADING.

1. A canal boat was taken in tow by the steamboat O., at New York, to be towed to Hudson. She was in the head tier of the boats towed astern of the O., and next to the outside boat on the starboard hand. When the steamboat and her tow were off Haverstraw, the canal boat sank. Her owners filed a libel against the O., to recover their damages. They alleged that, a storm arising on the passage, they hailed the steamboat to give notice that the canal boat was leaking and in danger, which hail was heard, but the steamboat kept on, no attention being paid to the hail, till the canal boat sank. They alleged negligence, in that the boat was improperly placed in the tow, because her stem projected beyond the stems of the other boats in the tier; that the tow should have been landed at Piermont, or at some pier above Piermont, or anchored; and that the steamboat should have gone to the east side of the river, as the wind blew from the north-east. On behalf of the O., all negligence was denied, and it was alleged that the canal boat was old and rotten and easily water-logged, and sank by reason of her being overladen and rotten, and that, as soon as any notice was given of the canal boat's being in danger, every effort was made to save her. It appeared in evidence that the steamboat stopped at Piermont for some time, and took another boat in tow, but no notice was there given from the canal boat that she was in danger. It also appeared that the hatches of the canal boat were not properly covered, and that her sinking was due to the water's finding its way into the hold through such open hatches: *Held*, that there was no peril to the boat before she reached Piermont or at Piermont; and that if there had been, it would have been gross negligence, directly causing the subsequent disaster, that those in charge of the canal boat did not make known the peril at Piermont, to those in charge of the steamboat, for which they had ample opportunity.

2. The sinking of the boat was caused by the hatches of the boat not being kept properly covered: and, although this was not set up as a defence in the answer, yet, as the evidence was not objected to when offered, it must be *held* to establish fault on the part of the canal boat, contributing to the disaster.

[Cited in Philadelphia & R. R. Co. v. New England Transp. Co., 24 Fed. 506.]

3. There was no negligence on the part of the steamboat in placing the boat where she was placed, although the master of the steamboat, according to his own testimony, thought the boat was old and weak, and was, therefore, bound to use great precaution in towing her.

4. There was no negligence on the part of the steamboat in not going up on the east side of the river, or in not leaving the canal boat at Piermont.

5. On the facts, although those on the canal boat signalled the steamboat as soon as the peril commenced, such signals were not seen or heard from the steamboat until a late period.

6. As the disaster was due to the uncovered condition of the hatches, and those on the steamboat were not informed of such dangerous condition, and did not hear the signals, because the boat was so far astern, in a place in which she was put without the expression of any desire on

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

the part of her captain to be placed alongside of the steamboat, where he could communicate with her more easily, the court must, though with some hesitation, acquit the steamboat of any negligence contributing to the disaster, and the libel must be dismissed.

In admiralty.

Wilcox & Hobbs, for libellants.

Benedict, Taft & Benedict, for claimants.

BLATCHFORD, District Judge. The libellants, as owners of the canal boat General Shields, and carriers of a cargo of coal on board of her, bring suit against the steamboat Oswego, to recover for the value of said canal boat and her cargo, and of the freight on the cargo, because of the sinking and loss of the canal boat and her cargo, in the Hudson river, off Haverstraw, on the morning of the 8th of June, 1873, while the canal boat was in tow of the steamboat Oswego, under tow from New York to Hudson. The canal boat was in the head row of boats behind the steamboat (there being several rows behind the head row, the head row and the other rows being towed by hawsers from the steamboat), and was the second boat from the starboard hand and the third boat from the port hand, there being four boats in the row, all of them loaded. There was one boat towed alongside of the steamboat, on her starboard side, all the way from New York. At Piermont, which was below where the boat in question sank, another boat was picked up. She was placed on the port side of the steamboat.

The libel alleges, that the steamboat proceeded from New York up the river with the tow, the tide being flood and the wind a strong breeze from the north-east and the water somewhat rough; that the wind increased in violence and the sea became rough, so that, when the tow had arrived about off Piermont, the navigation became difficult and dangerous; that, soon after leaving Piermont, the storm continued to increase in violence, and the navigation became very difficult and dangerous, the waves washing over the deck of the libellants' boat with great violence, so that it was with difficulty one could stand on her deck; that, soon after leaving Piermont, the libellant Patrick Cunningham (who verifies the libel), who was master of the boat and was on her deck, hailed those in charge of the steamboat, and cried out and beckoned to them that the boat was in danger and to come to his rescue, and to land his boat at some safe place; but that, although the hail was heard by them, and the condition of the boat was observed by them, they paid no attention to the repeated calls and signals, and continued on with the tow as usual, the said libellant continuing to cry out to the steamboat, and using all efforts at his command to prevail upon them to stop, for at least one hour; that when about 400 yards off the brickyard at Haverstraw, the boat became water-logged, her hatches being swept away

and everything off and about her decks, and she sank; that then. for the first time, the steamboat stopped; that the damage was in no way the fault of the libellants, but was solely owing to the negligence, want of care and unskilfulness of the master and owners of the steamboat, in this—that, when it was first discovered that the wind was increasing in violence, and the sea rough, the boat could and should have been shifted in the tow. so that her stem would not have projected beyond the stems of the boats in the same hawser tier, she being longer than the other boats, and for such reason receiving the full force of the winds and waves; that they did not make, or attempt to make, this change; that it was negligence to place her in that position in the tow; that the tow, or the libellants' boat, could have been landed at the Piermont pier, and this would have been a prudent course, as, even at that time, there were strong indications of an approaching and heavy storm; that, when the storm continued to increase, the steamboat could have stopped her headway and have come to a safe anchorage, or landed her tow, or a portion thereof, at a convenient or suitable dock along the western shore of the river, from Piermont to Haverstraw; and that the steamboat should have gone to the eastern side of the river, which would have been a prudent course, under the circumstances, there being a heavy wind from the north-east, and which was the course actually taken by other boats passing up the river with their tows at the time in question.

The answer alleges, that the canal boat was in as safe and as little exposed a position as she could be placed in; that the hawser tier was towed on a hawser about 500 feet long, and other boats were tailed on to said tier; that the steamboat, with her tow, proceeded up the river, the water being smooth, the tide running flood, and the wind blowing very light from the north, and arrived at Piermont at about four o'clock a. m., where she took in tow another boat on her port side, and went on up the river,. the weather being all the time pleasant, and the water smooth, and no storm whatever prevailing and the navigation in no way dangerous; that the steamboat with her tow continued on her voyage in safety, until she arrived within half a mile of Haverstraw, when, for the first time, those on board of the canal boat hailed the steamboat and informed those on board of the steamboat that the canal boat was in a sinking condition, and the steamboat was immediately headed for the nearest dock. in order to place the canal boat in a place of safety, but, before she could be got there, she sank in deep water, with her cargo on board; that the said hail was the first intimation that those on board of the steamboat had. that there was anything wrong with the canal boat, and, as soon as they learned that she was in a sink-

ing condition, they took every means in their power to save her, but, notwithstanding all such efforts, she sank; that the canal boat was old and rotten and easily water-logged, and was unfit to carry so heavy a load, and sank by reason of over-loading and rottenness, and not by reason of any stress of weather, or negligence of those on board of the steamboat; that the tow was made up in the usual manner, and the libellants' boat was placed where she was with their full knowledge and consent, and her stem did not project beyond the stems of the other boats in the tier so that she received the full force of the winds and waves; that no request was made by any one on the canal boat to land her at Piermont, or to change her position in the tow, and there were no indications, at that time, of an approaching and heavy storm, and it would not have been prudent, if such a storm had been approaching, to come to anchor, after leaving Piermont; that it was gross negligence on the part of those on board of the canal boat in not sooner informing those on board of the steamboat of her condition, in order that they might have sooner taken steps to save the canal boat and cargo; that the steamboat was not guilty of any negligence in the premises, but did all in her power to save the canal boat; and that the steamboat proceeded up the river in the usual and proper course.

On all the evidence in the case it is entirely clear, that, at no time while the tow was below Piermont, or was at Piermont, was there any peril to the canal boat. If there had been, it would have been gross negligence on the part of the canal boat, directly causing the subsequent disaster, for those in charge of her not to have made known that peril, at Piermont, to the persons in charge of the steamboat. There was abundant opportunity to do so. Hammond (the mate of the steamboat) and another man went from the stern of the steamboat, in the small boat of the steamboat, to the wharf at Piermont, getting on board of such small boat from the stern of the steamboat. The entire flotilla stopped off Piermont for some time. If any alarm had been given at Piermont from the canal boat, it must have been heard on the steamboat. I am satisfied no alarm was given at Piermont, or below Piermont. Moreover, on the evidence, there was no cause for alarm at or below Piermont, no such condition of the wind or the sea as to create alarm in the minds of those on the canal boat, no alarm or apprehension in their minds and, therefore, no manifestation of such alarm. It is incredible that, if they gave an alarm at Piermont, they were not heard. If they were in peril and gave no alarm there, they were grossly negligent. They gave no alarm there, for the reason that they were not in peril up to that time. They were not in peril up to that time, or they would have given an alarm there. The libel makes no suggestion of any peril, or of the giving of any signal, before reaching

Piermont or at Piermont. On the contrary, it states that the apprehension of peril and the signalling were after leaving Piermont. The story, brought out in the testimony of Cunningham and of Boyle, of the existing danger, and their appreciation of it, and their signalling because of it, before reaching Piermont, is an afterthought; and, if it were true, it would throw the entire fault for the disaster on the canal boat, because, the canal boat could easily have been taken care of at Piermont, and those on the steamboat had no notice while at Piermont that the canal boat needed to be taken care of; and if she did need to be there taken care of, those on board of her knew it while there, and yet omitted to give notice to the steamboat while at Piermont, which could readily have been done.

That the canal boat sank because of perils which arose after leaving Piermont is clear. That she sank because water from waves raised by the force of the wind came upon her deck and found its way thence into her hold, and so filled her, is also clear. It is also established, I think, by the evidence, that such water found its way into her hold because those on board of her negligently omitted to cover her hatch openings adequately with their proper coverings. That cause for the admission of water to her hold is shown to have existed. The coming of the water upon her deck in parts where it could find access to the hold through the uncovered hatch openings, and in sufficient quantities to produce, in view of the depth to which she was loaded, the mischief which ensued, is shown. This cause was an adequate one for the disaster, and no other cause is shown. The answer represents, that, after leaving Piermont, the water was smooth, and the navigation not dangerous; and, in order to account for the sinking of the canal boat, it alleges that she was old and rotten, and easily water-logged, and unfit to carry so heavy a load, and sank by reason of over-loading and rottenness, and not by reason of any stress of weather. The fact that the canal boat sank because of negligence on the part of those on board of her in leaving room for the water to go down her hatch openings, is not set up in the answer. Yet it is clear that the water which dashed upon her deck, and found its way into her hold through her hatch openings, sank her, and that such water came upon her deck because of the waves raised by the wind which blew. There is no evidence that age or rottenness, or a tendency to be easily water-logged, in the sense of the answer, or over-loading, on the part of the canal boat, in a like sense, had anything to do with her sinking. She was adequate to the trip in respect of sea-worthiness and of load, with the weather and waves such as they were below Piermont. It was the condition of things above Piermont which overcame her —a more violent wind and a higher sea. Yet there is every evidence that she would have

been safe even then, if her hatch openings had been covered. The libel, in accounting for the sinking, states that the waves washed over the deck, and finally her hatches were swept away, and she became water-logged, and sank. It avers, however, that the damage was not caused by any fault on the part of the libellants; and the evidence introduced on the part of the defence, to show the particular negligence of those on board of the canal boat in leaving the hatch openings uncovered for the entrance of the water which came aboard when the waves rose, was not objected to by the libellants, on the ground that no such fact was set up in the answer.

It must, therefore, be held that there was fault on the part of the canal boat, contributing to the disaster.

A much more difficult question is as to whether the steamboat also was in fault. The first inquiry is, whether she was in fault in any of the particulars specially set up in the libel. As to the allegation that it was negligence in the steamboat, when the sea became rough, not to shift the canal boat in the tow, so that her stem would not project beyond the stems of the boats in the same row, and that, because of such projecting, she received the full force of the waves, and that it was negligence to so arrange her in the tow, I am not satisfied that she projected ahead to any such extent that she shipped enough more water to have made any substantial difference, in her actual predicament of load and open hatches. She was protected by the boats on either side of her, but she was low in the water. If she was to be in the hawser tier at all, her position in it was, on the evidence, as safe and as good a one as she could have had; and I cannot doubt that, if she had been the outside boat on either side of the row she was in, she would have been in a worse position. The negligence alleged in the libel, of not landing her at Piermont, has been already considered. No reason is given, in the libel, why the tow should have gone up on the east side of the river, other than that there was a heavy wind from the north-east. But the evidence shows that the wind was not from the north-east, but was from such a direction that a course up the western side of the river was full as safe as any other.

There remains the allegation of negligence, in the libel, in that, when the storm continued to increase, the steamboat could have stopped her headway and come to a safe anchorage, or landed her tow, or a portion thereof, at a convenient or suitable dock along the western shore of the river, from Piermont to Haverstraw. That the steamboat, if advised of the peril of the canal boat, when such peril first became manifest to those on board of the canal boat, could have taken such measures as would have saved the canal boat from sinking, I cannot doubt. The continued towing of the canal boat against a head wind and a head sea, after she was in

peril, in the condition of load and of uncovered hatch openings in which she was, caused her to sink. She was a considerable distance behind the steamboat; and, while it is shown that those on the canal boat signalled, by waving and shouts, to the steamboat, as soon as there was any real peril to the canal boat, and continued such signals for a long time, it is also evident that the persons on the steamboat did not hear or see such signals until a late period.

Dubois, the master of the steamboat, testifies, that he examined the canal boat before he placed her in the tow, and told her captain that she was a bad one and that he hardly knew where to put her so she would go safely; that he noticed she was old and worn-out and rotten; and that, before he fastened her in the tow, he thought she was not a fit boat to tow. Certainly, after this notice and these conclusions, it was the duty of the master of the steamboat to use great and extraordinary precautions in towing the canal boat, to place her where he would be sure to be in communication with her promptly, for any exigency that might arise, such as did arise, in the increased sea from the increased wind, and to see that, if he thought her unfit to endure what the other boats would endure safely, she should not be subjected to what she could not endure. When the tow started from New York, the steamboat had but one boat alongside of her, and that was a loaded boat, on her starboard side. The boat picked up at Piermont was put alongside of the steamboat, on her port side. There was thus a vacant place where the libellants' canal boat might have been placed. If it be said that she would, in her condition, have been more exposed to danger alongside of the steamboat, it is still true that she would have been open to the immediate observation of those on board of the steamboat, and notice of danger could have been promptly heard or seen. Yet, in the condition in which the canal boat was, being low in the water with her load, it was incumbent on those on board of her to take adequate precautions against the danger of the rising of the wind and sea, and the coming on her deck of water which might find its way into her hold in quantities too great to be thrown out by pumping. They did not take such adequate precautions, and therein there was negligence which contributed to the disaster. But, that being the real cause of the disaster, it cannot be said that the steamboat was responsible in any degree for the condition of the hatch openings. It is in evidence that the boat was so full of coal, that the piling of the coal in the hatchways prevented the covers from going down to their proper seats. This was, perhaps, something which those in charge of the steamboat might have observed before the canal boat was taken in tow, but it could not be apparent to them that water coming upon the deck of the canal boat would be likely to go down into the hold in such quantities that it could not be freed by prop-

er pumping with proper pumps. This matter of the water going down the hatch openings was something for which the steamboat cannot be held to have been responsible. So that, after all, the question is, simply, whether there was negligence in the fact that this canal boat, in her condition, and in view of what is held to have been the cause of the disaster, was put behind, and not alongside of, the steamboat. It is not shown that the captain of the canal boat expressed a desire, before the tow started, to have his boat put alongside of the steamboat. On the contrary, he manifested his acquiescence in being placed where he was. The libel does not allege, as negligence in the steamboat, that she did not place the canal boat alongside of her, either originally or afterwards. On the whole case, though with considerable hesitation, I must acquit the steamboat of negligence contributing to the disaster, and must dismiss the libel, with costs.